**GIBSON, DUNN & CRUTCHER LLP**
Matthew K. Kelsey
Alan Moskowitz
200 Park Avenue
New York, NY 10166
(212) 351-4000 (Tel)
(212) 351-4035 (Fax)

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>YMAGIS SA,[1]<br><br>Debtor in a Foreign Proceeding. | Chapter 15<br><br>Case No. 20-_____ (__) |

**DECLARATION OF FOREIGN REPRESENTATIVE IN SUPPORT OF VERIFIED CHAPTER 15 PETITION AND EMERGENCY MOTION FOR PROVISIONAL RELIEF**

I, Jean Mizrahi, do hereby declare, under penalty of perjury under the laws of the United States of America, that:

1. On July 27, 2020 (the "***Petition Date***"), Ymagis SA ("***Foreign Debtor***") commenced a chapter 15 case (the "***Chapter 15 Case***") by filing a petition seeking recognition of the *redressement judiciaire* proceeding (the "***Foreign Proceeding***") currently pending before the Commercial Court of Paris (*Tribunal de commerce de Paris*) (the "***French Court***") as a foreign main proceeding pursuant to chapter 15 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "***Bankruptcy Code***"). In its opening ruling, the French Court held that I have been

---

[1] The Foreign Debtor's French SIREN Number is 499 619 864. The location of the Foreign Debtor's registered office is 61 Boulevard, MacDonald, 75019 Paris, France.

appointed to act as the foreign representative of the Foreign Debtor in connection with the Chapter 15 Case.

2.  I currently serve as the Chairman and Chief Executive Officer of the Foreign Debtor. I co-founded the Foreign Debtor in 2007 with my business partner, Christophe Lacroix. My professional experience includes (a) serving as Managing Director of Eclair Group, a French film laboratory, (b) founding Decoralia, an e-commerce website dedicated to interior design and furniture, (c) serving as Managing Partner of the financial advisory and asset management firm Lazard, where I set up Lazard's Asian branch with offices in Singapore, Hong Kong and Beijing, (d) serving as Deputy Chief Executive Officer of Elysée Investissements, an investment fund, and (e) working for the French Ministry of Industry and for the Department of Treasury. I graduated from the *École Polytechnique* and *École Nationale des Ponts et Chaussées*, which are engineering schools in France.

3.  I submit this declaration in support of (a) the *Verified Petition Under Chapter 15 for Recognition of a Foreign Main Proceeding* (together with the *Chapter 15 Petition for Recognition of a Foreign Proceeding (Official Form 401)* filed for the Foreign Debtor, the "**Petition**") and (b) the *Emergency Motion for Provisional Relief* (the "**Emergency Motion**"), each filed contemporaneously herewith, and to provide an overview of the Foreign Debtor and its current circumstances. I have reviewed the Petition, and it is my belief that the relief sought therein is essential to the Foreign Debtor's reorganization in the Foreign Proceeding as described in the Petition.

4.  Except as otherwise indicated, the facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the Foreign Debtor's advisors and by employees with responsibility for the relevant business and

2

corporate matters addressed in the Petition, or my opinion based upon experience, knowledge, and information concerning the Foreign Debtor and its worldwide affiliates (the "***Group***") and the industry in which it operates. I am authorized to submit this declaration on behalf of the Foreign Debtor, and if called upon to testify, I would testify competently to the facts set forth herein.

Section I of this declaration describes the Group's businesses, corporate structure, history and current indebtedness. Section II describes the events giving rise to the Foreign Proceeding. Sections III describes the Group's prepetition restructuring efforts. Section IV describes the Foreign Proceeding and the Chapter 15 Case.

**I.     Overview of the Group**

**A.     Overview of the Group's Business**

5.     I co-founded the Foreign Debtor in 2007 with my business partner, Christophe Lacroix. The Foreign Debtor is a French-based company engaged in the digital cinema sector, specializing in digital technologies for the film and audiovisual industry. Services performed by the Foreign Debtor include rental of equipment related to the manufacture and circulation of audiovisual works, and the acquisition and holding of direct or indirect interests in companies that perform similar or complementary activities in the digital cinema area. The Foreign Debtor's headquarters is located in Paris, France.

6.     At its founding, the Foreign Debtor's business centered around financing and leasing digital cinema equipment in France and Europe. Since then, the Foreign Debtor set about diversifying its business. Today, the Foreign Debtor, through its direct and indirect subsidiaries (collectively, the "***Group***"), has four business units:

7.     **CinemaNext** is a cinema operating services company, offering innovative solutions for film exhibitors. Services include the sales and installation of projection and sound systems, supplying consumables and spare parts, design, consulting, maintenance, technical

3

support, software solutions, seating and interior cinema layout, content management, 3D projection systems and glasses, dynamic display screens, and virtual reality. CinemaNext technicians have installed more than 13,000 screens to date, and approximately 9,500 screens in Europe are currently under service contracts. The main service center is located in Liège-Blegny (Belgium), and regional offices are present in 26 territories across Europe, the United States, Africa and the Middle East.

8.    **Éclair** provides content and distribution services to the motion picture and television industries including post-production, versioning and accessibility (*e.g.*, subtitles and dubbing), digital distribution, preservation and theatrical delivery. Éclair was founded in 1907 in the early days of cinema. It is headquartered in Paris-Vanves (France) and has creative and distribution offices located in London, Berlin, Karlsruhe, Madrid, Barcelona, New York, Liège, Vicenza, Augy-Auxerre, Malakoff, Strasbourg and Rabat.

9.    **Illucity** operates four virtual reality adventure parks in France and also provides virtual reality activities via franchise contracts for the operation of virtual reality adventure parks by cinema multiplexes, family entertainment centers, and location-based entertainment centers (*e.g.*, a place of business that hosts virtual reality experiences).

10.    **Virtual Print Fees** ("*VPF*") relating to the financing and leasing of digital cinema equipment. A VPF is a remuneration paid by film distributors for the opportunity to have their films screened by digital cinema equipment financed by Ymagis. VPFs were a useful mechanism to bring cinemas into the digital age, although these agreements have begun to phase out on a country by country basis. The Group has installed approximately 6,400 screens with VPF contracts. VPF sales are expected to decrease and come to an end by 2022.

11. The Foreign Debtor currently has a staff of 28, all of whom are located in France, and the Group has approximately 750 full-time staff. The Group currently has 63 companies located in 22 countries, 17 of which are in Europe (France, Austria, Belgium, Belarus, the Czech Republic, Germany, Spain, the United Kingdom, Croatia, Hungary, Luxembourg, Italy, the Netherlands, Poland, Portugal, Romania, Russia, Spain and Switzerland) and the remainder in the United States, United Arab Emirates, Morocco and Turkey. Through its business units, the Group generated total revenues of €166.9 million in 2018 and €156 million in 2019.

B. **Deployment Agreements**

12. In connection with the distribution of films on digital projection equipment, the Foreign Debtor is a party to various film or other media digital cinema deployment agreements (the "*Deployment Agreements*") with United States counterparties. These Deployment Agreements have the potential to yield significant revenue for the Group.

13. A number of the Deployment Agreements contain "ipso facto" termination clauses, allowing the relevant counterparty to terminate such Deployment Agreement due to the bankruptcy and/or insolvency of the Foreign Debtor.

C. **Overview of the Group's Financial Position and Capital Structure**

14. The Foreign Debtor is a société anonyme, which is the French equivalent of a U.S. corporation, organized and existing under the laws of France. As reflected in the organizational chart attached hereto as **Exhibit A**, the Foreign Debtor is the direct or indirect parent of all other companies in the Group.

15. The Foreign Debtor has authorized and issued one class of common stock, which has been listed on the NYSE Euronext market in Paris since its initial public offering on May 7, 2013. As of March 31, 2020, (a) Targetin SAS, a holding company controlled by me in my

5

individual capacity and owned by me and by employees and ex-employees of the Group, held 22% of the outstanding shares, and (b) the general public held 78% of the outstanding shares.

16. Following a restructuring transaction completed in March 2020 (the "**Restructuring**"), discussed further below, the Foreign Debtor had a total of €26.8 million in debt maturing over seven years, consisting of (a) "Super Senior Debt" in the amount of €6.9 million, with priority over all other residual financial debt, maturing in 2022 ("**Super Senior Debt**"), (b) "Senior Debt 1" in the amount of €16.6 million, maturing in 2024 with a possible extension to 2025 if no refinancing has been put in place by 2024 ("**Senior Debt 1**"), and (c) "Senior Debt 2" in the amount of €3.2 million, which is subordinate to the Senior Debt 1 with respect to the proceeds from any sale of assets, maturing in 2026 with a possible extension to 2027 ("**Senior Debt 2**").

17. Pursuant to the Restructuring, the Foreign Debtor also issued €9.2 million in convertible bonds maturing September 30, 2024, subject to the Foreign Debtor's right to "call" or repurchase all or part of the bonds under certain conditions linked to the Foreign Debtor's available liquidity (the "**Convertible Bonds**"). The bondholders were given the right to convert the Convertible Bonds twice a year at the end of the 18-month period following their issuance. The Convertible Bonds would accrue annual interest of 3% payable through the transfer of five new or existing ordinary shares of the Foreign Debtor per bond every six months. Each bond has a value of €1,000 and would be redeemed for 333 ordinary shares of the Foreign Debtor upon maturity, corresponding to an implied price of €3.00 per ordinary share.

18. Additionally, pursuant to the Restructuring, then-existing shareholders of the Foreign Debtor received one equity warrant for each existing ordinary share held, with two

6

warrants allowing them to subscribe for one new ordinary share at a price of €3 per ordinary share (the "**Warrants**").

19. The Foreign Debtor's capital structure has not substantially changed following the Restructuring. However, as discussed further below, as a consequence of the commencement of the *redressement judiciaire*, the Restructuring Agreement (defined below) is terminated by operation of French insolvency laws, and the French Court will determine the effect of such termination on the transactions involved in the Restructuring.

## II.    Events Giving Rise to the Foreign Proceeding

20. The cinema industry was hit hard by the global shutdown resulting from Covid-19. Before the Covid-19 pandemic, the Group benefited from profitable operations with a positive EBITDA of €8 million euros in 2019 and a strong start to 2020. Because the Group's revenues are almost entirely derived from the cinema industry, the total shutdown of theaters in France and elsewhere for almost three months caused by Covid-19 had a severe, negative impact on the Group's business activity. To make matters worse, the Group had placed large orders with its suppliers based on its strong start to 2020, but the months-long shutdown drastically reduced the Group's income, and the recovery has been slow even as certain countries emerge from lockdown.

21. Seeking to generate liquidity, the Foreign Debtor conducted discussions with equity investors, but failed to obtain the liquidity needed to ensure the Group's long-term viability. Further, the Foreign Debtor's banks denied its application for a French state-guaranteed loan because of the recent Restructuring despite satisfying all the criteria for such a loan.

22. Unable to meet unprecedented challenges posed by the economic dislocation caused by the Covid-19 pandemic, on June 24, 2020, the Foreign Debtor and certain (but not all) of its subsidiaries in the Group filed with the registry of the French Court a declaration of cessation of payments in order to obtain the opening of a court-ordered *redressement judiciaire*. The other

7

Group companies involved in the *redressement judiciaire* are CinemaNext France, Ymagis Engineering Services, Éclair Digital Service, Éclair Media and Villette Virtual. The remaining Group companies are not affected by the *redressement judiciaire* and continue their business activities outside of a court-supervised procedure in any jurisdiction.

23. The Foreign Debtor has paid a retainer to Gibson, Dunn & Crutcher LLP in which the Foreign Debtor has a *pro rata* ownership interest. The retainer is held in a Citibank bank account located in New York.

### III. Financial Restructuring Efforts Prior to Commencement of the Foreign Proceeding

24. Prior to the Restructuring, the Foreign Debtor had approximately €52 million in debt that it was struggling to service. Therefore, in February 2019, the Foreign Debtor entered into discussions with its bondholders and bank creditors, supervised by a court-appointed ad hoc representative (*conciliateur*), Maître Jonathan El Baze, with a view to reducing the total amount of the Foreign Debtor's net financial debt, strengthening the Group's capital position, and rescheduling the repayment of the Foreign Debtor's residual debt. During the negotiations, the Foreign Debtor and its advisors redefined a business plan and a sustainable level of debt in line with the Group's prospects.

25. After several standstill agreements had been granted to the Foreign Debtor, the negotiations resulted in a restructuring agreement (the "**Restructuring Agreement**") that was unanimously approved by the Foreign Debtor's bondholders and bank creditors. The Restructuring Agreement provided a sustainable framework for the Group's activities, its employees and its customers, and offered its existing shareholders the opportunity to participate in the Group's recovery.

26. The Group consummated the Restructuring in March 2020, following entry of an order by the President of the French Court on March 27, 2020 approving the Restructuring Agreement in accordance with article L.611-8 of the French Commercial Code. Pursuant to the Restructuring: (a) €13.9-16.2 million in debt was written off, (b) €9.2 million in debt was exchanged for the Convertible Bonds, (c) €26.8 million in debt was reinstated and rescheduled over seven years, consisting of the Super Senior Debt, Senior Debt 1, and Senior Debt 2, (d) then-existing shareholders received the Warrants, and (e) the French State accepted the repayment of the Foreign Debtor's public debt on a 12-24-month basis. The Restructuring reduced the Group's net financial debt by approximately 47%.

### IV. The Foreign Proceeding and this Chapter 15 Case

27. As noted above, on June 24, 2020, the Foreign Debtor filed a request to open the Foreign Proceeding with the French Court. In an order dated June 30, 2020 (the "***Redressement Order***"), the French Court opened the Foreign Proceeding and authorized me, as the foreign representative of the Foreign Debtor, to commence this Chapter 15 Case. On July 27, 2020, I caused the Foreign Debtor to file an Official Form 410 (Chapter 15 Petition for Recognition of a Foreign Proceeding) commencing this Chapter 15 Case.

28. As a consequence of the commencement of the *redressement judiciaire*, the Restructuring Agreement is terminated by operation of French insolvency laws. Hence, none of the terms of the Restructuring Agreement remain in effect. The French Court will determine the effect of such termination on the Foreign Debtor's capital structure and the transactions involved in the Restructuring.

29. The *Redressement* Order expressly states, *inter alia*, that French insolvency laws prohibit contractual counterparties from terminating any contract or agreement with the Foreign Debtor due to the bankruptcy or insolvency of the Foreign Debtor, and its entry automatically

9

imposes a stay on certain creditor actions. This relief is critical to the success of the Foreign Proceeding to ensure that the Foreign Debtor is not deprived of valuable contractual rights, including those arising from the Deployment Agreements, solely due to its commencement of the Foreign Proceeding. To ensure that this relief extends to contracts whose subject matter and/or counter-parties are located within the United States, the Emergency Motion requests that the Court grant provisional relief to extend the protections of sections 362 and 365(e) of the Bankruptcy Code until the Court decides whether to grant the Petition. The Petition requests that the Court approve the application of section 365(e) to this Chapter 15 Case on a final basis *nunc pro tunc* to the Petition Date, to ensure that counter-parties comply with the *Redressement* Order and do not use the commencement of the Foreign Proceeding as a basis to terminate or modify contracts.

## CONCLUSION

In conclusion, for the reasons stated herein and in the Petition, I respectfully request that (a) the Emergency Motion and (b) the Petition for recognition of the Foreign Proceeding as a foreign main proceeding each be granted in its entirety, together with such other and further relief as this Court deems just and proper.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: July 27, 2020

                                                            /s/ *Jean Mizrahi*
                                                            Name: Jean Mizrahi
                                                            Title: Foreign Representative

**Exhibit A**

**Organizational Chart**

# Legal chart of the group as at 31 Mars 2020

